1    **WO**

2

3

4

5

6

7                   IN THE UNITED STATES DISTRICT COURT

8                      FOR THE DISTRICT OF ARIZONA

9

10   Paula K. Jeffries,                    )    No. CIV 12-853-TUC-LAB
                                           )
11              Plaintiff,                  )    **ORDER**
                                           )
12   vs.                                    )
                                           )
13   Carolyn W. Colvin, Commissioner of    )
     Social Security,                       )
14                                          )
                Defendant.                  )
15   _____       )
                                           )
16

17          The plaintiff filed this action for review of the final decision of the Commissioner for

18   Social Security pursuant to 42 U.S.C. § 405(g).  (Doc. 1)

19          The Magistrate Judge presides over this case pursuant to 28 U.S.C. § 636(c) having

20   received the written consent of both parties.  *See* FED.R.CIV.P. 73; (Doc. 19).

21          The final decision of the Commissioner is not "supported by substantial evidence and

22   free from legal error."  *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989).  Specifically, the ALJ

23   failed to properly assess the claimant's non-exertional limitations in light of the contradictory

24   medical record.  The case will be remanded for further proceedings.

25

26          PROCEDURAL HISTORY

27          On January 11, 1994, Jeffries constructively filed an application for disability insurance

28   benefits.  (Tr. 13, 50)   She alleged disability beginning on August 17, 1993, due to organic

1   solvent induced immunotoxicity syndrome, toxic encephalopathy, post-traumatic distress

2   disorder, and chemical sensitivity.   (Tr. 70)   Her claim was denied initially and upon

3   reconsideration. (Tr. 55-58, 61-64)

4         Jeffries requested review and appeared with counsel at a hearing before Administrative

5   Law Judge (ALJ) Frederick J. Graf on August 17, 1995.   (Tr. 36)   In his decision, dated

6   February 23, 1996, the ALJ found Jeffries was not disabled. (Tr. 13-19) Jeffries appealed, but

7   the Appeals Council denied review making the decision of the ALJ the final decision of the

8   Commissioner.   (Tr. 4-5);   *See Bass v. Social Sec. Admin.*, 872 F.2d 832, 833 (9th Cir. 1989).

9         Jeffries filed an action for review in U.S. District Court, lost,  and subsequently appealed

10  to the Ninth Circuit.   2001 WL 312380 (9th Cir. 2001).   The Ninth Circuit reversed and

11  remanded the case to the Commissioner for further proceedings.  *Id*.

12        Jeffries appeared with counsel at a second hearing before ALJ Graf on March 18, 2004.

13  (Tr. 406-458)   In his decision, dated May 25, 2004, the ALJ again found Jeffries was not

14  disabled. (Tr. 390-398)  Jeffries appealed, but the Appeals Council denied review making the

15  decision of the ALJ the final decision of the Commissioner.  (Tr. 374-376)

16        Jeffries again filed an action for review in U.S. District Court, lost, and subsequently

17  appealed to the Ninth Circuit.  2007 WL 3390932 (9th Cir. 2007).  The Ninth Circuit reversed

18  again and remanded the case to the Commissioner for further proceedings.  *Id*.

19        Jeffries appeared with counsel at a hearing before ALJ Norman R. Buls on January 18,

20  2011. (Tr. 1475-1500)  In his decision, dated March 17, 2011, the ALJ found Jeffries was not

21  disabled. (Tr. 922-933)  Jeffries appealed, but the Appeals Council denied review making the

22  decision of the ALJ the final decision of the Commissioner.  (Tr. 895-897)

23        Jeffries subsequently filed the pending action for review of the Commissioner's final

24  decision.  (Doc. 1)  She argues the ALJ failed to properly account for her non-exertional

25  limitations such as her mental impairments and environmental limitations and failed to properly

26  assess her own credibility.  (Doc. 20, pp. 8-14)

27

28        <u>Claimant's Work History and Medical History</u>

Jeffries worked for IBM from 1978 to 1989 in a number of different capacities. (Tr. 80) In 1987, she worked as an editorial specialist. (Tr. 1494) Later, she worked as a learning center coordinator. (Tr. 80, 1494)

In March of 1991, Jeffries began work as senior media technician in the University of Arizona Health Sciences Center. (Tr. 70-76, 1478)  She was essentially healthy until October of 1991 when she began to develop an intolerance for the chemical solvents in the air. (Tr. 70, 144)  She developed fatigue, which was diagnosed as depression. (Tr. 144)  Later, she developed headaches, sinus pain and congestion, burning eyes, cough, dyspnea on exertion, chest discomfort, and body aches. (Tr. 144)  In April of 1992, her workplace was moved out of the Health Sciences building in an effort to reduce her exposure to irritating fumes. (Tr. 70) She stopped working in August of 1993 due to Multiple Chemical Sensitivity and Toxic Encephalopathy. (Tr. 70)

Physical Impairments

In April of 1992, Jefferey Burgess, M.D., and Richard Dart, M.D., Ph.D., examined Jeffries and assessed "possible low[-] level formaldehyde exposure" and "dyspnea on exertion." (Tr. 145)  They advised that her office should be moved away from the Gross Anatomy and Cold Storage rooms. (Tr. 146)

In October of 1992, Jeffries was examined by her treating physician, Robert E. Rogers, M.D., for numbness and tingling down both legs. (Tr. 168) He noted Jeffries had suffered from fatigue since November of 1991, which he ascribed to depression. (Tr. 168) He now began to wonder if it was related to her formaldehyde exposure. (Tr. 168) Her previous complaints of eye and chest irritation had improved when she stopped working in an area of the building that had "some problems with formaldehyde and a questionable tight building syndrome." (Tr. 168) In January of 1993, Jeffries complained of a chronic cough lasting two months. (Tr. 159) Rogers assessed "cough as a manifestation of reactive airway disease." *Id*.

In January of 1993, James R. Carlson, M.D., an ear, nose, and throat specialist, assessed "laryngitis from three etiologies: reflex esophagitis, postnasal drip, and asthma." (Tr. 151, 153)

1    In February of 1993, Jeffries was examined by an allergy specialist, Uwe Manthei, M.D.,

2  (Tr. 154-55) He assessed her with allergic rhinitis and "possible adverse reaction to nonspecific

3  irritants." (Tr. 155) In March of 1993, Manthei and Jeffries discussed an earlier positive test

4  for IgE antibodies to formaldehyde. (Tr. 150), see (Tr. 174, 185)

5    In July of 1994, Lyle H. Boyea, M.D., reviewed the medical record for the state disability

6  determination service. (Tr. 113-121) He concluded Jeffries had no exertional limitations but

7  did have environmental limitations. *Id*. She should avoid concentrated exposure to cold and

8  "avoid even moderate exposure" to "fumes, odors, dusts, gases, poor ventilation, etc." due to

9  possible reactive airway disease. (Tr. 118)

10    The record contains treatment notes from Michael R. Gray, M.D., M.P.H. (Tr. 180-81,

11  243-244, 249-50, 258-263, 265-66) In November of 1994, Gray diagnosed 1. Aldehyde

12  induced toxicity; 2. Immune toxicity; 3. Toxic encephalopathy; 4. Sensitivity to multiple

13  chemicals; 5. Esophageal reflux with hyperacidity and associated chronic cough; 6.

14  Occupational asthma; and 7. Acute bronchitis. (Tr. 265) He completed a Residual Physical

15  Functional Capacity Assessment. (Tr. 267-274) He opined Jeffries could lift or carry 20

16  pounds occasionally and less than 10 pounds frequently. *Id*. She could stand and/or walk for

17  less than 2 hours in an 8-hour day. *Id*. He did not indicate how long she can sit, but he did

18  explain that she needs to periodically alternate between sitting and standing due to her myalgias

19  and fibromyositis. (Tr. 268) She should never climb ramps, stairs, ladders, ropes, or scaffolds.

20  *Id*. She has manipulative limitations due to balance problems and fatigue. (Tr. 270) She has

21  visual limitations due to problems with focusing. (Tr. 270) She should avoid all hazards such

22  as machinery and heights. (Tr. 271) She should avoid all exposure to fumes, odors, dusts,

23  gases, and poor ventilation. (Tr. 271) In January of 1995, Gray opined that "Paula Jeffries is

24  permanently and totally impaired with regard to the ability to pursue gainful employment." (Tr.

25  260-261)

26    Gray's diagnosis was questioned by Irving S. Belzier, M.D., who testified before ALJ

27  Graf as a medical expert at the hearing conducted on March 18, 2004. (Tr. 433-441) Belzier

28  stated that Gray's diagnosis "with respect to chemical sensitivities is one of a controversial

1   nature." (Tr. 434)  In other words, his diagnosis is one about which there is no general medical

2   consensus.  *Id.*

3          In March of 1997, Jeffries was evaluated by John B. Sullivan, Jr., M.D., for the State

4   Compensation Fund, an Arizona worker's compensation insurance provider. (Tr. 633)  Sullivan

5   opined that Jeffries does not suffer from immunotoxicity or toxic encephalopathy.  *Id.*  Instead,

6   he opined she "suffers from a stress disorder relating to fears and threats from her previous

7   environmental exposure to formaldehyde."  *Id.*  He believed, "[i]f she is able to function in her

8   home environment, she would probably function in an environment that meets ASHRAE

9   [American Society of Heating, Refrigeration, and Air Conditioning Engineers] standards of

10  ventilation."  *Id.*

11

12          Mental Impairments

13          In November of 1993, Jeffries was evaluated by neuropsychologist Sheila Bastien, Ph.D.

14  (Tr. 193-229)  Bastien diagnosed Axis I:  Post-Traumatic Stress Disorder, with anxiety and

15  depression;  Axis II:  No diagnosis;  Axis III:  Toxic encephalopathy; multiple chemical

16  sensitivity by history;  Axis IV:  Severity of Psychosocial Stressors:  5 (Extreme);  Axis V:

17  Current, [Global Assessment of Functioning] GAF: 45.  (Tr. 215)  She opined that "in a normal

18  office environment where scents were present she would have severe problems with memory,

19  concentration, motor function and tactual-kinesthetic ability."  (Tr. 214)

20          In March of 1994, Bastien wrote a supplementary neuropsychological report in support

21  of Jeffries's Social Security claim.  (Tr. 245-248)  Bastien opined that Jeffries meets Social

22  Security listing 12.02 Organic Mental Disorders and 12.04 Affective Disorders.  *Id.*  She wrote,

23  "it is my opinion that Ms. Jeffries is totally and completely disabled from any gainful

24  employment at present, and this is based on <u>multiple</u> areas of disability."  (Tr. 249)  (emphasis

25  in original)  It is not clear why Bastien's second report cited organic disorders and affective

26  disorders while her original report cited only post-traumatic stress disorder.

27          In August of 1994, Jeffries was examined by Jill M. Plevell-Omdahl, Ph.D.  (Tr. 253-

28  255)  Plevell-Omdahl found no evidence in support of a diagnosis of PTSD, and rejected the

1  conclusions reached by Bastien. *Id.* In fact, she did not find evidence for any specific mental

2  disorder. *Id.* She did, however, find some mental impairment. *Id.* She concluded, "this client

3  is capable of performing simple tasks." (Tr. 255)  "She can understand and carry out

4  directions." *Id.* "She may have some difficulty remembering instructions." *Id.* "She could not

5  demonstrate good judgment." (Tr. 255)

6       In September of 1995, Jeffries was referred to Hector J. Fernandez-Barillas, Ph.D., for

7  psychometric consultation. (Tr. 357-368) He diagnosed Axis I:  Adjustment disorder with

8  mixed anxiety and depressed mood;  Axis II:  No diagnosis or condition;  Axis III:  Toxic

9  encephalopathy and multiple chemical sensitivity by history;  Axis IV:  Psychosocial and

10  environmental problems:  unemployment and inadequate finances;  Axis V: Current GAF: 45;

11  Highest GAF Past Year: 45. (Tr. 362) He found moderate limitation in the functional areas of

12  understanding and memory, sustained concentration and persistence, social interaction, and

13  adaptation. (Tr. 365-66) He wrote, "[c]laimant's limitations have been the result of unexpected

14  exposure to chemicals to which she's been sensitive secondary to the formaldehyde toxicity."

15  (Tr. 367) "She seemed to be otherwise functional but her vulnerability remains a formidable

16  obstacle." *Id.* It is unclear why Fernandez-Barillas documented so many areas of moderate

17  limitation and yet concluded she was "otherwise functional."  It is possible he believes she

18  would be functional if she were in a controlled environment, but he does not say that explicitly.

19       In October of 1995, Jeffries was examined by David A. Ruben, M.D., for the state

20  disability determination service. (Tr. 369-372) Ruben diagnosed Axis I:  1. Adjustment

21  disorder with depression, mainly exhibited as irritability. 2. Cognitive disorder, NOS;  Axis

22  II:  No diagnosis;  Axis III:  There is documentation in the chart of immune sensitivity

23  secondary to toxic exposure.  Multiple headache, fatigue, muscle pains and other symptoms as

24  described in reports;  Axis IV:  Inability to pursue work;  inability to go out into her

25  environment;  difficulty with mental concentration and effort,  which decreases her social

26  support. Axis V: GAF: 45. (Tr. 372) Ruben was impressed by many aspects of her higher

27  mental functioning, but he noted "the fluidity and fluency of her speech and thought processes

28  [are] impaired." (Tr. 372) He concluded "this lady is sensitive to exposure in all except a

controlled environment." *Id.* "In addition, any exposure increases her symptomatology which includes difficulty with concentration, irritability, and cognitive functions." *Id.* "Additionally she has physical symptoms most prominently of headache, fatigue, muscle and joint pains, which make functioning limited, as described above." *Id.*

The record contains an IQ evaluation administered by Alice F. Chang, Ph.D. in March of 2004. (Tr. 883-885) Chang was in general agreement with Barillas's Medical Source Statement, but she believed that Jeffries's "ability to make judgments that are commensurate with the functions of unskilled work has deteriorated since 1995." (Tr. 885) "Her inability to verbalize in a timely fashion causes her much hesitancy and would cause her not to be able, if stressed at all, to make work related decisions appropriately." (Tr. 885)

In September of 2004, a physician, whose signature is illegible, reviewed the medical record for the state disability determination service. That physician found no medically determinable psychological impairment. (Tr. 122-131)

In February of 2005, Robert Estes, M.D., reviewed the medical record for the state disability determination service and completed a Psychiatric Review Technique form. (Tr. 133-143) He found no medically determinable impairment. *Id.*


Hearing Testimony

On January 18, 2011, Jeffries appeared with counsel at a hearing before ALJ Norman R. Buls. (Tr. 1475) She was 52 years old at the time of the hearing, 39 years old on her last insured date. (Tr. 1476) In her application for benefits, she alleged disability beginning on August 17, 1993, due to organic solvent induced immunotoxicity syndrome, toxic encephalopathy, post-traumatic distress disorder, and chemical sensitivity. (Tr. 70)

Jeffries worked for IBM from 1978 to 1989 in a number of different capacities. (Tr. 80) In 1987 she worked as an editorial specialist. (Tr. 1494) Later, she worked as a learning center coordinator. (Tr. 80, 1494)

Toward the end of 1993, Jeffries worked as a senior media technician "providing audio/visual setups, microphone setups and stuff for the College of Medicine at the University

1    of Arizona Hospital. . . ." (Tr. 1478)  There, she was exposed to formaldehyde, which she

2    believes triggered her current impairment.  (Tr. 70)

3         Her condition has not improved significantly since her exposure.  (Tr. 1478)  In fact, she

4    believes her ability to concentrate and process information is getting worse.  (Tr. 1479)  She still

5    experiences fatigue, generalized pain, and sleep that is not restful.  (Tr. 1480)  She gets hoarse

6    and has a chronic cough.  (Tr. 1481)  Exhaust fumes cause her muscles to contract painfully.

7    (Tr. 1481-82)  New carpeting causes her to feel intolerable pressure in her head.  (Tr. 1482)

8         She writes for a newsletter that is published by a non-profit entity run by her friend.  (Tr.

9    1482)  Writing, however, is frustrating for her because it takes such a long time.  (Tr. 1482,

10   1484)

11        Vocational expert Kathleen McAlpine testified that Jeffries could perform her past

12   relevant work as an editorial specialist if she could tolerate exposure to "moderate fumes, odors,

13   gases, poor ventilation or dust, but nothing more than moderate." (Tr. 1492-1495), see (Tr. 80)

14   McAlpine did not believe Jeffries could return to work as a media technician because such a

15   person would work in many places and could be occasionally exposed to substandard air

16   quality.  (Tr. 1495)  In the alternative, McAlpine identified other jobs in the nation economy

17   that a person with Jeffries's limitations could perform – receptionist/information clerk, customer

18   service representative, and order clerk.  (Tr. 1495)

19

20   CLAIM EVALUATION

21        Social Security Administration (SSA) regulations require that disability claims be

22   evaluated pursuant to a five-step sequential process.  20 C.F.R. §§ 404.1520, 416.920; *Baxter*

23   *v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991).  The first step requires a determination of

24   whether the claimant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4),

25   416.920(a)(4).  If so, then the claimant is not disabled, and benefits are denied.  *Id.*

26        If the claimant is not engaged in substantial gainful activity, the ALJ proceeds to step

27   two, which requires a determination of whether the claimant has a "medically severe impairment

28   or combination of impairments."  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  In making a

1    determination at step two, the ALJ uses medical evidence to consider whether the claimant's

2    impairment more than minimally limits or restricts his or her "physical or mental ability to do

3    basic work activities." *Id*.  If the ALJ concludes the impairment is not severe, the claim is

4    denied. *Id*.

5        Upon a finding of severity, the ALJ proceeds to step three, which requires a

6    determination of whether the impairment meets or equals one of several listed impairments that

7    the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20

8    C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); 20 C.F.R. Pt. 404, Subpt. P, App.1.  If the claimant's

9    impairment meets or equals one of the listed impairments, then the claimant is presumed to be

10   disabled, and no further inquiry is necessary. *Ramirez v Shalala,* 8 F.3d 1449, 1452 (9th Cir.

11   1993).  If the claimant's impairment does not meet or equal a listed impairment, evaluation

12   proceeds to the next step.

13       The fourth step requires the ALJ to consider whether the claimant has sufficient residual

14   functional capacity (RFC)[1] to perform past work.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

15   If yes, then the claim is denied. *Id*.  If the claimant cannot perform any past work, then the ALJ

16   must move to the fifth step, which requires consideration of the claimant's RFC to perform

17   other substantial gainful work in the national economy in view of the claimant's age, education,

18   and work experience.  20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

19       In determining whether the claimant retains the ability to perform other work, the ALJ

20   may refer to the Medical Vocational Guidelines ("the grids") promulgated by the SSA. *See* 20

21   C.F.R. Pt. 404, Subpt. P, App.2; *Desrosiers v. Secretary of Health and Human Services,* 846

22   F.2d 573, 576-577 (9th Cir. 1988).  The grids categorize jobs according to their exertional

23   requirements such as sedentary work, light work, or medium work. *Tackett v. Apfel*, 180 F.3d

24   1094, 1101 (9th Cir. 1999).  The grids calculate whether or not the claimant is disabled based

25   on the claimant's exertional ability, age, education, and work experience. *Id.*  The grids are a

---

[1] Residual functional capacity is defined as that which an individual can still do despite his or her limitations.  20 C.F.R. §§ 404.1545, 416.945.

1    valid basis for denying claims where they completely and accurately describe the claimant's

2    abilities and limitations.  *Id.* at 1101-02.  If the claimant has only exertional limitations, the

3    claim may be resolved based only on the grids.  *Lounsburry v. Barnhart*, 468 F.3d 1111, 1115

4    (9th Cir. 2006).

5         If the claimant has significant non-exertional limitations, the grids do not apply.  *Penny*

6    *v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir.1993).  "Non-exertional limitations are limitations that

7    do not directly affect a claimant's strength."  *Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir.

8    1988).  Mental limitations, for example, are non-exertional.  *Id.* at 1340-41.  If significant non-

9    exertional limitations prevent the claimant from performing the full range of work in any

10   exertional category, the ALJ must take the testimony of a vocational expert to deny the claim.

11   *Id.* at 1341.

12

13        The ALJ's Findings

14        At step one of the disability analysis, the ALJ found Jeffries "did not engage in

15   substantial gainful activity during the period from her alleged onset date of August 17, 1993

16   through her date last insured of December 31, 1997 . . . ."  (Tr. 924)  At step two, he found

17   Jeffries "had the following severe impairments: formaldehyde induced immune toxicity and

18   chemical sensitivity . . . ."  (Tr. 924)  At step three, the ALJ found Jeffries's impairments did

19   not meet or equal the criteria for any impairment found in the Listing of Impairments, Appendix

20   1, Subpart P, of 20 C.F.R., Part 404.  (Tr. 928)

21        The ALJ then analyzed Jeffries's residual functional capacity (RFC).  He found she "has

22   the residual functional capacity to perform a full range of work at all exertional levels but with

23   the following non[-]exertional limitations:  restricted to no more than moderate exposure to

24   fumes, odors, gases, poor ventilation and noticeable dust in the air."  (Tr. 928)

25        At step four, the ALJ found Jeffries "was capable of performing past relevant work as

26   an editorial specialist." (Tr. 931)  In the alternative, he found at step five that Jeffries was not

27   disabled using the grids.  He further found by relying on the testimony of the vocational expert

28

that Jeffries was able to work as a receptionist information clerk, telephone customer service representative, and order clerk.  (Tr. 932)

STANDARD OF REVIEW

An individual is entitled to disability benefits if he or she demonstrates, through medically acceptable clinical or laboratory standards, an inability to engage in substantial gainful activity due to a physical or mental impairment that can be expected to last for a continuous period of at least twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  "[A] claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy."  *Penny v. Sullivan,* 2 F.3d 953, 956 (9th Cir. 1993).

The findings of the ALJ are meant to be conclusive.  42 U.S.C. §§ 405(g), 1383(c)(3).  The decision to deny benefits "should be upheld unless it contains legal error or is not supported by substantial evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).   Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id*.  It is "more than a mere scintilla but less than a preponderance."  *Id*.

"Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld."  *Orn*, 495 F.3d at 630.  "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  *Id*.

In evaluating evidence to determine whether a claimant is disabled, the opinion of a treating physician is entitled to great weight.  *Ramirez v. Shalala,* 8 F.3d 1449, 1453-54 (9th Cir. 1993).  The ALJ may reject a treating physician's uncontradicted opinion only if she sets forth clear and convincing reasons for doing so.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  If the treating physician's opinion is contradicted by another doctor, the ALJ may reject that opinion only if he provides specific and legitimate reasons supported by substantial evidence

in the record. *Lester,* 81 F.3d at 830. No distinction is drawn "between a medical opinion as to a physical condition and a medical opinion on the ultimate issue of disability." *Rodriguez v. Bowen*, 876 F.2d 759, 761 n.7 (9th Cir. 1989).

"The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non[-]examining physician." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). "[T]he [ALJ] must provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of an examining physician." *Id.* "[T]he opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id.* at 830-31.

"Where medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the [ALJ]." *Magallanes,* 881 F.2d 747, 751 (9th Cir. 1989) (punctuation omitted). The ALJ's finding that a claimant is less than credible, however, must have some support in the record. *See Light v. Social Sec. Admin.,* 119 F.3d 789 (9th Cir. 1997).

The ALJ need not accept the claimant's subjective testimony of disability, but if he decides to reject it, "[]he must provide specific, cogent reasons for the disbelief." *Lester,* 81 F.3d at 834. "Unless there is affirmative evidence showing that the claimant is malingering, the [ALJ]'s reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id.*

DISCUSSION

In 2007, this case came before the Ninth Circuit for the second time. In the administrative decision then under review, the ALJ concluded that Jeffries's condition precluded her "exposure to fumes, dusts, odors, gases, and poor ventilation without qualification." 2007 WL 3390932 (9th Cir. 2001) (punctuation modified). Nevertheless, the ALJ concluded she could perform her past relevant work as a media technician because it "did not involve exposure to *excessive* dusts or odors." *Id.* (emphasis added) This contradiction

between Jeffries's relatively stringent air quality needs and the apparently run-of-the-mill quality of her workplace environment caused the Ninth Circuit to reverse the decision of the ALJ and remand for further proceedings.

In the decision under review today, the ALJ concluded that Jeffries can tolerate "*moderat*e exposure to fumes, odors, gases, poor ventilation and noticeable dust in the air." (Tr. 928) (emphasis added)  He found she has no nonexertional limitations provided she is not exposed to more than a moderate level of environmental contaminants.  *Id.*

The issue before the court is whether the ALJ's evaluation of Jeffries's limitations is supported by substantial evidence and free from legal error.  *See Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).  The court concludes it is not.  The court does not reach Jeffries's remaining claims of error.

The ALJ in this case accepted Jeffries's general contention that she suffers from formaldehyde induced immune toxicity and chemical sensitivity.  (Tr. 924)  Nevertheless, he found she has no nonexertional limitations provided she is not exposed to more than a moderate level of environmental contaminants.  He reached this conclusion after analyzing the rather extensive medical record.   His analysis of that record, however, does not support his ultimate assessment of Jeffries' RFC. *See, e.g., Toland v. Astrue*, 2008 WL 4643327, 8 (C.D.Cal. 2008) ("The RFC assessment must always consider and address medical source opinions, and if the assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted.").

The medical record contains reports from a large number of physicians.  Among those that contain significant functional analysis are the report from the treating physician, Grey, and the reports from examining physicians Bastien,  Plevell-Omdahl, Fernandez-Barillas, Ruben, Sullivan, and Chang.  The ALJ discounted Grey's report because his methods are controversial and not well supported by the general medical consensus.  *Id*.  The ALJ further discounted the findings of Bastien, Fernandez-Barillas, and Chang for various reasons.  (Tr. 931)  Assuming that the ALJ properly discounted those reports, his RFC should reflect the findings and judgment of the remaining examining physicians: Plevell-Omdahl, Ruben, and Sullivan.  The

medical record also contains functional reports from the non-examining state agency physicians, but unless the ALJ provides specific and legitimate reasons, the reports of the examining physicians should take precedence.  The Commissioner herself seems to agree that Jeffries's RFC should reflect the judgment of those physicians that the ALJ found to be reliable.  *See* (Doc. 31, p. 12)  ("The opinions of Drs. Plevell-Omdahl, Fernandez-Barillas, Ruben, and Sullivan constituted substantial evidence supporting the ALJ's finding of no mental impairment and no functional limitations.").  The ALJ's RFC, however, is not supported by the opinions of those examining physicians.

In October of 1995, Jeffries was examined by David A. Ruben, M.D., for the state disability determination service.  (Tr. 369-372)  Ruben diagnosed, among other things, "adjustment disorder with depression, mainly exhibited as irritability." (Tr. 372)   In his decision, the ALJ wrote that Jeffries suffered from mental impairment best characterized as "adjustment disorder with mixed anxiety and depressed mood." (Tr. 927) It therefore appears that the ALJ accepted Ruben's report and his conclusions.

Ruben, however, documented mental limitations that were present even where environmental contaminants are only moderate.  He noted "the fluidity and fluency of her speech and thought processes [are] impaired." (Tr. 372)  He concluded "this lady is sensitive to exposure in all except a controlled environment." *Id*.  "In addition, any exposure increases her symptomatology which includes difficulty with concentration, irritability, and cognitive functions . . . ." *Id*., *see also* (Doc. 31, p. 8)  "Additionally she has physical symptoms most prominently of headache, fatigue, muscle and joint pains, which make functioning limited, as described above." (Tr. 372)

The ALJ discounted Ruben's conclusions as to Jeffries's non-exertional limitations.  He is permitted to do so, but first he must offer his reasons.  And here he did not do that. *See Lewis v. Apfel,* 236 F.3d 503, 509 (9th Cir. 2001)  ("The ALJ is responsible for determining credibility and resolving conflicts in medical testimony and ambiguities.").  The court notes that those reasons would have to be somewhat nuanced because the ALJ appeared to accept Ruben's

1    diagnosis, and yet discounted his assessment of Jeffries's functional limitations. This is not

2    impossible to do, but it must be done explicitly.

3           The Commissioner argues to the contrary that Ruben "did not mention any specific

4    functional limitations." (Doc. 31, p. 12); *see also* (Tr. 927)  The court disagrees with the

5    Commissioner's characterization of the record.

6           A reverse situation is presented by Sullivan's medical report.  Sullivan found no

7    functional limitations in agreement with the ALJ.  His report does not, however, support the

8    ALJ's finding of impairment.

9           In March of 1997, Jeffries was evaluated by John B. Sullivan, Jr., M.D., for the State

10   Compensation Fund, an Arizona worker's compensation insurance provider.  (Tr. 633)  In

11   agreement with the ALJ, Sullivan concluded that Jeffries "would probably function in an

12   environment that meets ASHRAE [American Society of Heating, Refrigeration, and Air

13   Conditioning Engineers] standards of ventilation." *Id.*

14          On the other hand, Sullivan opined that Jeffries does not suffer from immunotoxicity or

15   toxic encephalopathy, while the ALJ found to the contrary that Jeffries suffered from a

16   "formaldehyde induced immune toxicity and chemical sensitivity." (Tr. 924) It is not clear why

17   the ALJ would accept the functional limitations from a medical source that completely rejected

18   the diagnosis that the ALJ believed was supported by the medical record. *Id.*  Of course, the

19   ALJ may to do so if he explains his reasons.  Here, he did not do so.

20          In August of 1994, Jeffries was examined by Jill M. Plevell-Omdahl, Ph.D.  (Tr. 253-

21   255)  Plevell-Omdahl diagnosed no mental impairment at all.  (Tr. 255)  She did find however

22   some mental limitations.  *Id.*  She concluded, "this client is capable of performing simple tasks."

23   (Tr. 255)  "She can understand and carry out directions." *Id.*  "She may have some difficulty

24   remembering instructions." *Id.*  "She could not demonstrate good judgment." (Tr. 255)

25          The report by Plevell-Omdahl does not support the ALJ's functional assessment at all.

26   She concluded Jeffries has no mental impairment, while the ALJ believed that Jeffries does have

27   an adjustment disorder. (Tr. 927) On the other hand, Plevell-Omdahl found mental limitations

28   that the ALJ did not.  She limited Jeffries to "simple tasks" and cautioned that she "may have

1   some difficulty remembering instructions." (Tr. 255)  As the court noted above, the ALJ could

2   discount Plevell-Omdahl's opinion, but he first must explain why.  That analysis is missing

3   from the decision.

4        The ALJ improperly discounted the opinions of the examining physicians.  "Where the

5   Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or

6   examining physician, we credit that opinion as a matter of law." *Lester v. Chater*, 81 F.3d 821,

7   834 (9th Cir.1996).  "Where we conclude that a claimant's testimony or a doctor's opinion

8   should have been credited and, if credited, would have led to a finding of eligibility, we may

9   order the payment of benefits." *Regennitter v. Commissioner of Social Sec. Admin.*, 166 F.3d

10  1294, 1300 (9th Cir.1999).

11       Here, however, the reports of the examining physicians contradict each other.  It is not

12  possible to credit each report.  The case must be remanded to allow the Commissioner to again

13  analyze the medical record, resolve the inconsistencies, and recalculate Jeffries's RFC.  *See,*

14  *e.g., Varela v. Colvin*, 2013 WL 1164776, 4 -5  (C.D.Cal. 2013)  (Remand was ordered where

15  the ALJ silently disregarded conflicting opinions in the medical record.);  *see also Lewis v.*

16  *Apfel,* 236 F.3d 503, 509 (9th Cir. 2001)  ("The ALJ is responsible for determining credibility

17  and resolving conflicts in medical testimony and ambiguities.").

18       On remand, the Commissioner may reexamine whatever evidence she feels necessary

19  to properly evaluate Jeffries's RFC.  She may find it prudent to recontact Bastien and

20  Fernandez-Barillas.  Further clarification from those physicians could explain why their

21  respective reports seemed to contain self-contradictory findings.  *See* 20 CFR § 404.1520b(c)

22  (discussing  methods for resolving an inconsistency in the record).

23

24       IT IS ORDERED that the final decision of the Commissioner is reversed.   The case is

25  remanded for further proceedings.

26       The Clerk of the Court is directed to prepare a judgment and close this case.

27

28            DATED this 5th day of December, 2013.

- 16 -

*Leslie A. Bowman*

Leslie A. Bowman
United States Magistrate Judge